1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3   UNITED STATES OF AMERICA,     )
                                  )
4        vs.                      )   Docket No. 5:18-CR-390-OLG
                                  )
5   (1) ROBERT MIKELL USSERY,     )   San Antonio, Texas
                                  )   May 29, 2018
6        Defendant.               )   10:35 a.m. to 11:16 a.m.
    _____)

7
        TRANSCRIPT OF PRELIMINARY HEARING AND DETENTION HEARING
8            BEFORE THE HONORABLE HENRY J. BEMPORAD
                UNITED STATES MAGISTRATE JUDGE
9
    A P P E A R A N C E S:
10
    FOR THE GOVERNMENT:
11       UNITED STATES ATTORNEY'S OFFICE
         By:  Sarah Wannarka, Esquire
12       601 N.W. Loop 410, Suite 600
         San Antonio, TX  78216
13
    FOR THE DEFENDANT:
14       LAW OFFICE OF GUILLERMO LARA, JR.
         By:  Guillermo Lara, Jr., Esquire
15       310 South St. Mary's Street, Suite 965
         San Antonio, TX  78206
16
    COURT RECORDER:  FTR Gold
17
    TRANSCRIBER:
18       CHRIS POAGE
         655 East Cesar E. Chavez Blvd., Suite G-65
19       San Antonio, TX  78206
         Telephone:  (210) 244-5036
20       chris_poage@txwd.uscourts.gov

21   Proceedings reported by electronic sound recording.  Transcript
     produced by computer-aided transcription.
22

23

24

25

INDEX

PAGE

KAITLYN O'CONNELL

Direct Examination by Ms. Wannarka .........................4

Cross-Examination by Mr. Lara ...........................11

Redirect Examination by Ms. Wannarka ....................20

Recross-Examination by Mr. Lara .........................23

1    (Open court at 10:35 a.m.)

2        THE COURT:  Good morning.  Please be seated.

3    Calling the case of SA-18-M-655.  That's *United States of*

4 *America versus Robert Mikell Ussery*.  If I could have

5 announcement of counsel, please.

6        MS. WANNARKA:  Sarah Wannarka for the United States.

7 Good morning.

8        THE COURT:  Good morning.

9        MR. LARA:  Guillermo Lara for the defendant, Judge.

10 Good morning.

11        THE COURT:  Good morning, Mr. Lara.

12    We're set for preliminary and detention hearings at this

13 time as I understand it.

14        MR. LARA:  That's correct, Judge.  We are moving

15 forward on both.

16        THE COURT:  All right.  Let me hear from the

17 government.

18        MS. WANNARKA:  Thank you, Your Honor.

19    The government calls Special Agent Kaitlyn O'Connell to the

20 stand.

21        THE COURT:  All right.  Ma'am, if you'll come forward,

22 the courtroom deputy will swear you in.

23    (The oath was administered)

24        THE COURT:  Good morning.

25    You may proceed, Ms. Wannarka.

1          KAITLYN O'CONNELL, GOVERNMENT'S WITNESS, SWORN

2                      DIRECT EXAMINATION

3    BY MS. WANNARKA:

4    Q.   Please tell the Court your name.

5    A.   Kaitlyn O'Connell.

6    Q.   How are you employed?

7    A.   I'm a special agent with ATF.

8    Q.   Generally, what are your duties?

9    A.   We investigate federal firearms violations.

10   Q.   Have you had the occasion to investigate a Robert Mikell

11   Ussery?

12   A.   Yes, ma'am.

13   Q.   Do you see him in the courtroom today?

14   A.   Yes, I do.

15   Q.   Can you please describe what he's wearing?

16   A.   He has on a blue v-neck, and he's sitting next to the

17   defense.

18          MS. WANNARKA:  Your Honor, if the record would reflect

19   that she's identified Robert Ussery.

20          THE COURT:  The record will so reflect.

21   BY MS. WANNARKA:

22   Q.   How did -- how did this defendant come onto law enforcement

23   radar?

24   A.   Originally, from what I understand, Wilson County Sheriff's

25   office had come in contact with him on different occasions down

1    in the Sutherland Springs area.  They had come in contact with

2    him when he was on different properties.  I believe he received

3    multiple trespassing violations, warnings in different areas.

4    Q.  And why was he down there?

5    A.  He was down there trying to talk to people about his news

6    organization.

7    Q.  And specifically with regards to Sutherland Springs, what

8    was he talking about down there?

9    A.  He was talking about the mass shooting from November 5th,

10   last year.

11   Q.  And what was he saying about it?

12   A.  He believed that it didn't actually happen; that it was a

13   hoax; and that nobody was killed.

14   Q.  In so doing, was he confronting the families of the victims

15   of Sutherland Springs?

16   A.  Yes, ma'am.

17   Q.  And specifically, was he confronting the pastor of the

18   First Baptist Church of Sutherland Springs?

19   A.  Yes, ma'am, on March 5th.

20   Q.  All right.  So how did ATF get involved?

21   A.  We were notified by other law enforcement agencies about

22   what was occurring.

23   Q.  The Texas Rangers and Wilson County?

24   A.  Yes, ma'am.

25   Q.  And so then did you have the occasion to meet with Wilson

1  County Sheriff's Department?

2  A.  I did.

3  Q.  And prior to meeting with them, had you learned or did you

4  believe that the defendant was a convicted felon?

5  A.  Yes.  At that time we believed that he was.

6  Q.  And since then, have you confirmed that he is a convicted

7  felon, prohibited from possessing firearms?

8  A.  Yes, ma'am.

9  Q.  Okay.  So when you met with Wilson County, is that when you

10  learned that there was a particular GoPro video?

11  A.  Yes, ma'am.

12  Q.  Okay.  So explain to the Court how that fits in, what

13  that -- what that is.

14  A.  So the one video that you're referring to was about part of

15  the confrontation that happened on March 5th outside the

16  Sutherland Springs church with the pastor.  At one point

17  Mr. Ussery walks back to his vehicle, takes a silver pistol,

18  semiautomatic, striker fired and places it under the floor mat,

19  which was seen on the video.

20  Q.  Okay.  Well, let's talk about the incident on March 5th.

21  You know of the incident because of your interaction with law

22  enforcement and because of a video that was made?

23  A.  Yes, ma'am.

24  Q.  And was this defendant actually wearing a GoPro camera

25  which was videotaping the entire encounter?

1   A.   Yes, he was.

2   Q.   Okay.  So with all of the sources of your information, tell

3   the Court what happened on March 5th, 2018.

4   A.   From me reviewing the video, Mr. Ussery, along with his

5   girlfriend, Jodie Mann, known as Conspiracy Granny, went down

6   to the area of the Sutherland Springs church with the Vice News

7   Group, and they were working on what appeared to be like a

8   documentary.  They then continued -- they interacted with the

9   pastor, which created an escalating confrontation.

10  Q.   Okay.  Where did this confrontation occur?

11  A.   On the property of the Sutherland Springs church.

12  Q.   And what type of confrontation ensued between this

13  defendant and the pastor?

14  A.   It started off as a conversation, then escalated.

15  Q.   A conversation about what?

16  A.   About the shooting at the Sutherland Springs church.

17  Q.   And what was this defendant saying about that?

18  A.   He was saying that it was a hoax and that nobody was killed

19  to the pastor and one of the other church members.

20  Q.   And, in fact, didn't the pastor lose a daughter in the

21  shooting?

22  A.   He did.

23  Q.   Describe the tone that this defendant approached the pastor

24  with.

25  A.   It was confrontational and then became threatening towards

1    the end as they continued.

2    Q.   Did he use curse words towards the pastor?

3    A.   Yes, ma'am.

4    Q.   And then was there actually a part where the defendant told

5    the pastor that the people would hang him for perpetrating the

6    hoax?

7    A.   Yes, ma'am.

8    Q.   Tell the Court about that.

9    A.   At that point in the conversation Mr. Ussery was talking to

10   the pastor with his voice raised, using curse words, saying

11   that the people would come after him, hang him, and then he

12   would piss on them -- and piss on him in the wind.

13   Q.   The defendant would urinate on the pastor after he was

14   hung?

15   A.   Yes, ma'am.

16   Q.   All right.  So then during this time was the other church

17   member that was there, had he reached out to Wilson County to

18   call the police?

19   A.   Yes, ma'am, he did.

20   Q.   Now, had the defendant and his girlfriend, Conspiracy

21   Granny -- had they been previously trespassed from that church

22   property?

23   A.   It was on that day.

24   Q.   That day?

25   A.   Yes.

1    Q.  And when the Wilson County Sheriff's came, what was that
2    encounter like?
3    A.  It was aggressive.  Mr. Ussery stated that he would have
4    them arrested on federal charges, and then eventually led to
5    his arrest.
6    Q.  What was he eventually arrested for that day?
7    A.  He was arrested for resisting arrest, criminal trespassing,
8    possession of marijuana less than two ounces, and terroristic
9    threat causing fear of imminent serious bodily injury.
10   Q.  And was Conspiracy Granny also arrested that day?
11   A.  She was.
12   Q.  Subsequent to that, did Wilson County seize the GoPro
13   camera that the defendant was wearing, get a search warrant and
14   watch it?
15   A.  Yes, ma'am.
16   Q.  And is that how you have a video of this confrontation?
17   A.  Yes.
18   Q.  As well as the defendant possessing the firearm?
19   A.  Correct.
20   Q.  Now, you said that the firearm the defendant possessed is a
21   striker fire?
22   A.  Yes, ma'am.
23   Q.  And we know that those were never made in Texas; is that
24   correct?
25   A.  Correct.

1   Q.  So it had been transferred in interstate --

2   A.  Nexus.

3   Q.  -- or foreign commerce?

4   A.  Yes, ma'am.

5   Q.  Was there a portion on the video, when the defendant was in

6   his truck and had placed the gun under the floor mat, that he

7   tried to disavow himself of the weapon?

8   A.  Yes, ma'am.

9   Q.  Tell the Court about that.

10      And as you're looking for that part in the complaint, this

11  conversation happened before Wilson County came and arrested

12  him; is that correct?

13  A.  Yes, ma'am, it is.

14  Q.  Okay.

15  A.  So this is what I gathered from the video.  They were just

16  getting to the vehicle.  Conspiracy Granny said, I hear sirens.

17      Mr. Ussery said, Good.  We don't have any stickers on this

18  car.

19      Conspiracy Granny said, I know.

20      Mr. Ussery then stated, The gun's under the mat.  So that's

21  yours?

22  Q.  And did that statement come after you were able to visibly

23  see him place the pistol under the floor mat?

24  A.  Yes, ma'am.

25  Q.  And then did he later also repeat, The gun is under the

1    floorboard?

2    A.  Yes, ma'am.

3              MS. WANNARKA:  I'll pass the witnesses.

4              THE COURT:  All right.  Mr. Lara, you may inquire.

5              MR. LARA:  Thank you, Judge.

6                        CROSS-EXAMINATION

7    BY MR. LARA:

8    Q.  Agent O'Connell, I have a few questions for you.  You

9    indicated that the reason that you were called -- or Mr. Ussery

10   was -- drew your attention was that Wilson County Sheriff's

11   Department had spoken to you or called you about it?

12   A.  I believe they actually contacted the Rangers first.  Then

13   we were contacted that way.

14   Q.  Okay.  So from the Rangers, you indicated -- and so the

15   information that you received from the Rangers were that -- was

16   that he received multiple trespass warnings; is that correct?

17   A.  From what I understand, there was.  Yeah.

18   Q.  And do you know when he received these trespass warnings?

19   A.  I do not.

20   Q.  Do you know how many, in fact, he actually received?

21   A.  No, sir.

22   Q.  Would it surprise you that the only warning that he

23   received was on that date in March of 2018?

24   A.  I don't have any specific knowledge to the past of the

25   dates.

1  Q.  Okay.  But you do have access to the GoPro in this case,

2  right?

3  A.  Yes, sir.

4  Q.  And in that GoPro, how many times is he asked not to be on

5  the property of the church?

6  A.  I don't recall.

7  Q.  Would it surprise you that it was only one time that he was

8  asked not to be in that property, and he removed himself?

9  A.  I don't recall the specifics of that.

10 Q.  Okay.  But you did watch the video, though, right?

11 A.  Yes, sir.

12 Q.  And so as far as the trespass warnings that he received, it

13 is -- is the street also property belonging to the church?

14 A.  I don't know the specifics of the -- who owns the property.

15 Q.  Okay.  Now, you indicated that Mr. Ussery had spoken with

16 the pastor on that date in March; is that correct?

17 A.  In front of the church on the video, from what -- that's

18 the only part that I know about.

19 Q.  Okay.  And so from the part that you know about, when he's

20 speaking to the pastor, you said it didn't start off as a

21 confrontational discussion; is that right?

22 A.  It started off pretty mild.

23 Q.  Pretty mild.  Okay.

24     Did you see in that video Mr. Ussery waving a handgun in

25 the face of the pastor?

1    A.   No, sir.

2    Q.   Was he -- was he placing his hands on the pastor?

3    A.   No, sir.

4    Q.   In fact, he was only using words; is that right?

5    A.   Correct.

6    Q.   Okay.  And words alone -- well, let me ask you this.  So in

7    terms of confronting the families, I believe you testified, who

8    did he specifically confront in Sutherland Springs?

9    A.   The person that I know is Pastor Pomeroy.

10   Q.   So it's only one person then, right?

11   A.   I don't know the names of the other people.

12   Q.   Okay.  So when you said that he was confronting the

13   families, you don't have any specific knowledge that that

14   actually took place?

15   A.   No, sir.  I'm relying on other law enforcement.

16   Q.   Okay.  So do you know when these other confrontations took

17   place?

18   A.   Not specifically.

19   Q.   Okay.  And do you know the number of times that Mr. Ussery

20   confronted anyone?

21   A.   No, sir.

22   Q.   So we're really here on just one allegation of harassment,

23   correct, of one of the citizens of Sutherland Springs?

24   A.   Yes, sir.  That's what I have knowledge of.

25   Q.   Okay.  Now, you indicated that the GoPro video that you

1  watched was obtained through a warrant that was issued from the

2  Wilson County Sheriff's Department; is that correct?

3  A.  Yes, sir.

4  Q.  Now, what was the basis and the probable cause for getting

5  into that video camera?

6  A.  That it was taken while he was arrested.

7  Q.  I'm sorry?

8  A.  Search incident to arrest, and that it had supporting

9  documentation of what had occurred that day.

10  Q.  So it's possible that that may not even be admissible

11  evidence?  Would you agree?

12  A.  That's not my decision.

13  Q.  Would you agree that that's possible?

14  A.  It's not my decision.

15  Q.  Now, you indicated that you witnessed Mr. Ussery grab a

16  handgun and place it under the floorboard?

17  A.  Yes.

18  Q.  Did you skip over the beginning portions of that video to

19  just get and focus on that section of it?

20  A.  No, sir.  I watched the whole video.

21  Q.  Okay.  And with respect to the interaction that he had with

22  the pastor, I believe you already testified that he did not

23  wave that handgun at the pastor; is that correct?

24  A.  Correct.

25  Q.  Did anyone know that Mr. Ussery was in possession of a

1   firearm, if that was true in fact -- that he was in possession

2   of a firearm?

3   A.  Part of that's still under investigation.

4   Q.  Okay.

5          THE COURT:  Wait a second.  I lost you there,

6   Mr. Lara.

7          MR. LARA:  Yes, sir.  I believe that was a very

8   horrible question, Judge.  It was --

9          THE COURT:  No, no, no.  I think your question was

10  good.

11     But, Ms. O'Connell, didn't you say that it sounded like

12  from the interchange on there that Ms. Mann knew about it

13  because they talked about it?

14         THE WITNESS:  Oh, yes, sir.  Yes, sir.

15         THE COURT:  All right.  But I gather, Mr. Lara, you're

16  talking about other people, like the people in the community

17  or -- that they knew about it?

18         MR. LARA:  Right.  Just the pastor or the other church

19  member that was there, if either one of them knew that

20  Mr. Ussery --

21         THE COURT:  Oh, I see.  Got it.

22         MR. LARA:  -- could have been in possession of a

23  firearm?

24         THE COURT:  Well, we don't know the other name of that

25  other person.  That's why I'm confused.

1          MR. LARA:  That's correct, Judge.  That's correct.

2          THE COURT:  Okay.  All right.  I got you.

3          MR. LARA:  Yes, Judge.

4          THE COURT:  I'm with you now.

5     I'm sorry, ma'am.  I lost between y'all on that issue.

6     Go ahead.

7          THE WITNESS:  Yes, sir.

8  BY MR. LARA:

9  Q.  And do you know that, if either the pastor or the other

10 constituent in the church were aware that he may be in

11 possession of a firearm?

12 A.  I don't have any information on that.

13 Q.  Okay.  Now, with respect to the commentary that you

14 described, was that Mr. Ussery specifically told the pastor

15 that -- and please correct me if I'm wrong -- that the people

16 would hang him for the hoax.  Is that right?  Is that accurate?

17 A.  Yes.

18 Q.  That's not Mr. Ussery; is that right?

19 A.  I'm sorry?

20 Q.  So he said -- what the statement was, was that the people

21 would hang him for the hoax.  Is that accurate?

22 A.  Yes.

23 Q.  Mr. Ussery didn't say, I will hang you for this hoax?

24 A.  Correct.

25 Q.  Okay.  Now, when you indicated that Mr. Ussery was

1    confrontational, did the entire confrontation take place in

2    front of this church?

3    A.  In or around that general area.

4    Q.  Okay.  And were you aware if the church themselves

5    requested a restraining order to prevent Mr. Ussery from going

6    back to the church?

7    A.  I am unaware of that.

8    Q.  Would you be surprised that there is a restraining order in

9    place?

10   A.  I wouldn't be surprised.

11   Q.  Okay.  And would you -- would you be surprised if

12   Mr. Ussery has not been back to that church since receiving

13   that restraining order?

14   A.  I don't have any knowledge of that, if he was there or not.

15   Q.  Okay.  Now, with respect to the warnings that he was given,

16   do you know if they were oral, or were they written?

17   A.  For what incident?

18   Q.  The warnings for not being present at the church's

19   property?

20   A.  You mean on March 5th?

21   Q.  Yes.  That's correct.

22   A.  I believe they were verbal.

23   Q.  Okay.  Now, did you -- did you have an occasion to speak

24   with Mr. Ussery prior to his arrest on this federal charge?

25   A.  Not prior to.

1    Q.   Okay.  Now, were you aware that on the day that he was

2    arrested for this federal charge, he was en route to the

3    Caldwell County Justice Center?

4    A.   Yes, sir.  That's where he was arrested.

5    Q.   And why was he arrested there?

6    A.   It's where we chose to arrest him.

7    Q.   Was there any specific planning that took place to get

8    Mr. Ussery there?

9    A.   There is always planning for operations.

10   Q.   Okay.  So, in fact, someone from the Caldwell County's

11   called Mr. Ussery, told him to be present at 11:00 to discuss

12   threats that he had -- the threats that had been made on his

13   life; is that correct?

14   A.   To my knowledge, yes.

15   Q.   Okay.  So, in fact, he -- and isn't it correct that

16   Mr. Ussery contacted law enforcement because he was afraid and

17   feared for his life?

18   A.   From what I understand.

19   Q.   Okay.  And you would agree with me that he actually went

20   down to the FBI office to let them know, Hey, there are threats

21   against my life, right?

22   A.   Yes.  I am aware of that.

23   Q.   Okay.  And on this day -- law enforcement didn't have to

24   look for Mr. Ussery; is that right?

25   A.   I don't understand your question.

1   Q.   So Mr. Ussery voluntarily transported himself at the

2   request of Caldwell County law enforcement to be present there;

3   is that correct?

4   A.   From what I understand, it was not law enforcement that

5   called him.

6   Q.   And who was it that called him?

7   A.   I believe it was the district attorney's office.

8   Q.   Okay.  And do you know -- was it to discuss the case that

9   he had filed against the threats he received?

10  A.   From what I understand.

11  Q.   Okay.  Now, when you were a part of this arrest, did

12  Mr. Ussery attempt to flee at any point?

13  A.   No, sir.

14  Q.   Did he -- did he fight anyone when he was being placed

15  under arrest?

16  A.   Not from what I was told.

17  Q.   Okay.  Did he make threats to you or anyone else in law

18  enforcement at the time of his arrest?

19  A.   Not that I have heard of.

20  Q.   Would you agree with me that he was cooperative?

21  A.   Yes, sir.

22  Q.   In fact, he handed you keys and other belongings; is that

23  correct?  So that you could continue your investigation; is

24  that right?

25  A.   Yes, sir.  We asked for them.

1   Q.   Okay.  And he was very compliant with that; is that right?

2   A.   He was.

3   Q.   Okay.  Do you believe he's a -- he's a flight risk?  Do you

4   know if he has a passport?

5   A.   I don't know his personal history.

6   Q.   Okay.  Do you know if he has a passport?

7   A.   I do not know.

8   Q.   Do you believe that he's going to flee from these charges?

9   A.   I don't know him well enough to be able to answer you that.

10  Q.   Okay.  And do you believe that, again, if he's abiding by

11  the restraining order, which is in effect in Caldwell County,

12  that would protect the citizens of Sutherland Springs?

13  A.   Again, that's not my decision.

14          MR. LARA:  No further questions, Judge.  Pass the

15  witness.

16          THE COURT:  All right.  Very well.

17      Yes, Ms. Wannarka.

18                      REDIRECT EXAMINATION

19  BY MS. WANNARKA:

20  Q.   You mentioned an operation, that there was an operation

21  that led to the defendant's request.  Was it a goal to arrest

22  him away from his property where he lives?

23  A.   Yes, ma'am.

24  Q.   And he lives in Caldwell County?

25  A.   He does.

1  Q.  And did you want to arrest him away from the property

2  because you were going to be executing a search warrant at his

3  residence?

4  A.  Yes, ma'am.

5  Q.  And did you, in fact, execute, or did ATF and law

6  enforcement execute a search warrant at his residence?

7  A.  Yes, we did.

8  Q.  What did you find of note?

9  A.  In summary, we found ten firearms, one of which was a .50

10 cal., two AR-type rifles.

11 Q.  You said you found ten firearms?

12 A.  Yes, ma'am.

13 Q.  One of which was a what?

14 A.  A .50 caliber rifle.

15 Q.  A .50 caliber rifle.

16     What else?

17 A.  Two AR-type rifles, I believe a couple of shotguns and

18 pistols.

19 Q.  Did you find any rounds of ammunition?

20 A.  Yes, ma'am.

21 Q.  How much?  Approximately how many rounds?

22 A.  Approximately, close to a thousand rounds.

23 Q.  Are you aware of any of these death threats that have been

24 made against the defendant and why they've been made against

25 the defendant?

O'Connell - Redirect                          22

1  A.  I have heard of them.  I've never witnessed any of them.

2  Q.  And what is it that you've heard?

3  A.  I have heard that he was making threats against some of the

4  victims and threatening them.

5  Q.  And then they were threatening him back?

6  A.  Yes, ma'am.

7  Q.  All right.  Thank you.

8          MS. WANNARKA:  I'll pass the witness.

9          THE COURT:  All right.  I had one question, and then

10  I'll let you inquire.

11      You mentioned a search of -- that was -- of the GoPro.  I

12  gather there was no search of that vehicle that Mr. -- that you

13  mentioned Mr. Ussery was in.  That's the one where I think you

14  saw the GoPro.  Was that like a Tahoe?  Is that the -- no, a

15  white Chevy pickup truck?

16          THE WITNESS:  It was a Chevy pickup truck.

17          THE COURT:  Yeah.  There wasn't -- to your knowledge

18  was there a search of the vehicle?

19          THE WITNESS:  I believe there was like a preliminary

20  search, but not an in-depth search.

21          THE COURT:  Okay.  All right.  That was my only

22  question.

23      Of course, Mr. Lara, you can inquire about the matters that

24  Ms. --

25          MR. LARA:  Yes, Judge.

 1          THE COURT:  -- Wannarka went into and, of course, the

 2   question I just asked as well.

 3          MR. LARA:  Sure.  Just a few questions on that.

 4                    RECROSS-EXAMINATION

 5   BY MR. LARA:

 6   Q.  So you attempted to effectuate a search of Mr. Ussery's

 7   property; is that correct?

 8   A.  Yes.

 9   Q.  And you indicated that there were some firearms in his

10   place of residence?

11   A.  Yes, sir.

12   Q.  Okay.  Now, through your investigation did Mr. Ussery

13   threaten anyone with these firearms?

14   A.  Not that I'm aware of.

15   Q.  Okay.  And you're aware of the fact that Mr. Ussery, even

16   though he may have a prior conviction, he's allowed to have a

17   firearm in his home?  Is that -- do you know that?

18   A.  Not under federal guidelines.

19   Q.  But under Texas law he's allowed to do that, though, right?

20   A.  I don't know Texas law enough to be able to answer you.

21          MR. LARA:  No further questions, Judge.

22          THE COURT:  All right.  Anything else, Ms. Wannarka?

23          MS. WANNARKA:  No, Your Honor.

24          THE COURT:  All right.  Thank you, ma'am.  You may be

25   excused from the witness stand.

1        Ms. Wannarka, any other witnesses you'd like to present on

2   the issue of probable cause?

3            MS. WANNARKA:  No, Your Honor.

4            THE COURT:  All right.  Mr. Lara, I'm happy to hear

5   any evidence you'd like to present with regard to the probable

6   cause question.

7            MR. LARA:  No, Your Honor.  No further --

8            THE COURT:  All right.  Any argument the parties like

9   to make, I'm happy to hear it.

10           MS. WANNARKA:  Not from the government.

11           THE COURT:  All right.  Mr. Lara, do you want to raise

12  any argument with regard to the question of probable cause in

13  the case?

14           MR. LARA:  Judge, I believe there's issues that will

15  be better served in another hearing with respect to the video

16  footage, which was the basis of this -- of this allegation

17  that --

18           THE COURT:  All right.  Oh, Mr. Lara, that reminds me.

19  I was going to inquire.  Have you received a copy of the --

20  have you seen the entirety of this footage?

21           MR. LARA:  I have not, Judge.  I have not.

22           THE COURT:  Okay.  All right.  Very well.

23           MR. LARA:  Thank you, Judge.

24           THE COURT:  All right.  Well, thank you.

25        All right.  Well, based on the representation of the party,

1    I'll find probable cause for the case to go forward.  However,
2    Mr. Lara, when you -- this -- clearly Ms. -- the testimony
3    presented to me was based on this video.  If upon your review
4    of the video, there's an issue that you need to raise with the
5    Court with regard to the preliminary examination, I will
6    reconsider at that time, once you've had an opportunity to
7    watch the entirety of the video.
8              MR. LARA:  Thank you, Judge.
9              THE COURT:  All right.  Now, let's turn to the
10   question of detention in the case.
11      Ms. Wannarka, I will consider the agent's testimony on the
12   issue of detention or release.  I also have before me a
13   pretrial services report.  Have you reviewed that report?  Do
14   you have any objections or corrections to that report?
15             MS. WANNARKA:  I have reviewed the report.  I don't
16   have any changes or corrections.  And I don't have any
17   additional evidence.
18             THE COURT:  All right.  Very well.
19      Let me then turn to you, Mr. Lara.  Have you had a chance
20   to review this report with your client, and do you have any
21   corrections or objections to the report?
22             MR. LARA:  Judge, we have reviewed the report, Judge.
23             THE COURT:  All right.
24             MR. LARA:  The only issue that we had, Judge, was one
25   of the -- one of the allegations with respect to an issue on --

1   on Page 5, Judge.

2         THE COURT:  All right.

3         MR. LARA:  The bottom of that page.

4         THE COURT:  Okay.  Hold on a second.  All right.  I'm

5   with you.  Yes, sir.

6         MR. LARA:  It's a case out of Brazoria County alleging

7   an evading arrest.  I was speaking with my client about this

8   offense.  He doesn't seem to recall this, whether or not there

9   was any type of a sentence actually imposed in this case.

10         THE COURT:  I see.

11         MR. LARA:  So we'd like to look into that further,

12   Judge.

13         THE COURT:  All right.  Well, it's over 20 years old.

14   It's not something that I would be likely to consider in making

15   the determination as to detention or release.  So I'm not going

16   to particularly rely on that one, though it is an evading

17   arrest conviction.  That is something that can matter to the

18   Court.  I won't consider that at this time.

19         MR. LARA:  Thank you, Your Honor.

20         THE COURT:  However, if the parties need to present

21   more information on that at a later time, I'll consider it.

22         MR. LARA:  Thank you, Judge.

23         THE COURT:  All right.  You may proceed.

24         MR. LARA:  I believe that was the only issue that we

25   had with respect to --

1          THE COURT:  All right.  Well, with that one exception,

2    I will consider then the pretrial services report.

3        And let me ask you, Mr. Lara, whether there's any

4    additional evidence you would like to present by way of proffer

5    or witness at this time?

6          MR. LARA:  Judge, the only evidence that we'd present,

7    we would like to present three affidavits, Judge, in the way of

8    proffer for the Court's consideration.  I'll hand them to the

9    government for inspection.

10          THE COURT:  All right.

11          MR. LARA:  They are affidavits from Edith Dalecki,

12    Mr. Ussery's mother --

13          THE COURT:  All right.

14          MR. LARA:  -- as well as Jodie Mann and Mr. Ussery

15    himself.

16          THE COURT:  All right.  Very well.

17        I think Ms. Mann was in the courtroom.  I don't know if

18    she's still in the courtroom.  And I don't know about

19    Mr. Ussery's mother.

20          MR. LARA:  No, she's not.  She's actually ill, Judge.

21          THE COURT:  Oh, all right.

22          MR. LARA:  She actually [inaudible] I'll let the Court

23    know.

24          THE COURT:  All right.  Very well.

25          MS. WANNARKA:  I don't have any objection if you are

1   offering these three into evidence --

2         THE COURT:  All right.  Then --

3         MS. WANNARKA:  -- for this hearing.

4         THE COURT:  All right.  Very well.  If you'll present

5   them then to my courtroom deputy.

6         MR. LARA:  Yes, Judge.

7         THE COURT:  Let me just review them.  See if I had any

8   questions that I need to inquire of with regard to the proffer.

9      (Pause)

10        THE COURT:  All right.  I don't -- I'm happy to accept

11  the proffers as made.  I don't think I need any questions of

12  either Mr. Ussery or of Ms. Mann or of Mr. Ussery's mother, who

13  obviously is too ill to attend.

14        MR. LARA:  Yes, Judge.

15        THE COURT:  I'll consider all these -- all the

16  affidavits as presented.

17        MR. LARA:  Thank you, Judge.

18        THE COURT:  All right.

19        MR. LARA:  And she did say she was available by phone

20  should the Court need to reach her.

21        THE COURT:  I don't think I need any inquiries.  And

22  it doesn't sound like the government needs to either.  So I'm

23  going to consider all this evidence.

24        MR. LARA:  Thank you, Judge.

25        THE COURT:  All right.

1       MR. LARA:  Aside from that, Judge, I did just want to

2  make a point.  I know Mr. Ussery did relate to me when the

3  agent testified that none of those firearms are actually his

4  firearms.  He's been on that property for the past ten years,

5  as the affidavit shows.  And so that was something that was

6  there with respect to -- with respect to the home that he lives

7  in there on that -- on that -- let's see, Judge.  I believe the

8  property's address is 464 Payne Lane, is what it was, Judge.

9       THE COURT:  Yeah.  And that's the address that's

10  included in the pretrial services report.

11     And I don't know if it was -- I may have missed it in

12  Mr. Ussery's affidavit.  Were those under some sort of lock and

13  key?  Do you have information as to where they were -- where

14  those firearms were?  I don't think the agent knew about it,

15  didn't get into that.

16     But it may be, Ms. Wannarka, you can tell me, too.

17       MS. WANNARKA:  I just didn't ask her.  And just --

18       THE COURT:  I understand.  That's fine.

19       MS. WANNARKA:  -- for the sake of time, I think if she

20  were to testify again, she would say that many of them were in

21  the living area in the area where Mr. Ussery lived, sitting

22  there unlocked --

23       THE COURT:  That's what I was wondering, if there was

24  like a locker.  Sometimes they have lockers --

25       MS. WANNARKA:  -- and available.  Some were --

```
1              THE COURT:  -- stuff like that.
2              MS. WANNARKA:  -- some were in a Conex container, but
3    there were --
4              THE COURT:  What's a Conex?  I'm sorry.
5              MS. WANNARKA:  Like a storage unit on the --
6              THE COURT:  Oh, I see.
7              MS. WANNARKA:  -- property.  But others were
8    readily -- in his living area.
9              THE COURT:  All right.  I'll see if there's much of a
10   dispute on this.  Mr. Lara, is that approximately correct?
11   There's some in the area.  They didn't -- according to
12   Mr. Ussery, didn't belong to him, but they were in that area,
13   and some were in a locker?  I mean, a storage compartment?  A
14   storage compartment?
15             MR. LARA:  Yes, Judge.  And just for the added fact
16   that the building is double locked on the front door with
17   respect to the entrance.  But where the firearms were --
18             THE COURT:  Mr. Ussery's home or --
19             MR. LARA:  Yes.  Yes, Judge.
20             THE COURT:  -- that storage container?  Maybe both.
21             THE DEFENDANT:  Both.
22             MR. LARA:  Both, Judge.
23             THE COURT:  All right.  I'll accept -- I'm going to
24   accept all of that.  This sounds like there wasn't much of a
25   dispute about that.  I'm going to accept all this evidence.
```

1    Thank you very much.

2              MR. LARA:  Thank you, Judge.

3              THE COURT:  And I'll consider all that proffer.

4        Let me hear then from the government on the question of

5    detention or release.

6              MS. WANNARKA:  Thank you, Your Honor.

7        The government's asking that the defendant be detained

8    pending trial in this matter.  And really and truly, it comes

9    down to him being a danger to the community.  And most

10   specifically, he is a danger to the Sutherland Springs

11   community.  He has terrorized them, multiple people, most

12   specifically Pastor Pomeroy, on a number of occasions in

13   threatening, ugly, confrontational manners.

14       You know, it's one thing to believe something, quite

15   frankly, that's outrageous.  The fact that that Sutherland

16   Springs shooting is a hoax is utterly -- to think that, is

17   ludicrous.  That's fine.  In this world he can think that.

18       But what makes him dangerous is that he went and confronted

19   people.  This incident isn't even -- it's only been six months.

20   On May -- on March 5th it had been six months.  People were

21   healing.  People were still upset, and he found it necessary to

22   go and confront these people.

23       And Pastor Pomeroy didn't just lose his daughter.  He lost

24   a majority of his church.  So to go and spew hate and just

25   ugly, confrontational words for no reason at all makes him a

1    danger.

2        And the fact that he is prohibited from carrying weapons

3    and had one when he was found confronting the pastor, and had

4    multiple weapons at his home at his disposal, he's not charged

5    with felon in ownership of a firearm.  He's charged with felon

6    in possession of a firearm.  And he absolutely had control,

7    management over all of those high-power, large-capacity

8    weapons, with enough ammo to do a lot of damage.

9        And for those reasons we believe he is absolutely a danger

10   to this community.  And I don't think there are conditions for

11   somebody like this that would keep him -- keep the community

12   safe and keep that community of Sutherland Springs from having

13   to look over their shoulder for him.

14       Thank you.

15           THE COURT:  All right.  One -- let me just make sure

16   I'm understanding one part of your argument.  There's -- one

17   part is that the guns present a danger because they can be used

18   violently against persons.  But I think you understand -- your

19   argument is also that the threats themselves are that -- and

20   the confrontations themselves are, in fact, endangering and

21   victimizing people in Sutherland Springs.  And that's one of

22   the conditions -- one of the things that you're worried about.

23           MS. WANNARKA:  Absolutely, Your Honor.

24           THE COURT:  I understood it to be both those

25   arguments.

1          MS. WANNARKA:  Yes, Judge.

2          THE COURT:  All right.

3          MS. WANNARKA:  Because he had repeatedly gone back

4    down to that community and approached different people, they're

5    scared of him.

6          THE COURT:  All right.  Very well.

7      Mr. Lara, let me hear from you, sir.

8          MR. LARA:  Yes, Judge.

9          THE COURT:  And I tried to clarify because I would

10   like to address both those issues --

11         MR. LARA:  Yes.

12         THE COURT:  -- as I understand the government's

13   argument.

14         MR. LARA:  Yes, Judge.

15      Judge, it's our position that the government hasn't proven

16   by clear and convincing evidence that no conditions will

17   reasonably assure the safety of the community.  Now, if --

18   looking at the argument with respect to the firearms, there are

19   conditions that can be set to assure that Mr. Ussery will not

20   be in possession of any firearms.  And that's something that

21   could be addressed by this Court.

22      Not only that, Judge, with respect to the instant case, the

23   perceived dangerousness to the community is the risk that

24   Robert will engage in continued harassment, threats, while

25   pending trial for this offense.  The record doesn't support

1    that conclusion.

2        With respect to the evidence that was presented by the

3    agent, whether or not there was one instance of harassment,

4    which was alleged, we don't have any support to indicate that

5    he was there on multiple, multiple occasions.  Now, the

6    restraining order was in effect, and Mr. Ussery has abided by

7    that.

8        So clearly, he understands that he is going to abide by

9    that and not bother these individuals and continue to go back

10   to that location.  So there isn't an ability and there is a

11   possibility to keep him away from them.

12       Not only that, Judge, Mr. Ussery, through his proffer, has

13   indicated to this Court that he's willing to just take it all

14   down, make sure that he wants to move forward with his life.

15   He's lived in this residence in Texas for his entire life.  No

16   evidence has been presented that he had a firearm, was

17   brandishing a firearm and threatening this pastor.

18       Now, there's some issues that were there, Judge.  But we

19   don't believe that the evidence has been provided to support

20   that he's a threat to the community.

21       Now, again, Judge, with respect to his previous cases,

22   Judge, which the Court has, you know -- older cases which have

23   been presented to the Court, he's always appeared.  He has

24   never -- it's never been an issue with him failing to appear.

25   He's completed probation successfully in the past.  His mother

1  supports him, and he's going to live with her should this Court

2  grant him a bond.

3      And she really needs him right now.  As the affidavit

4  shows, she's going through an extremely tough time right now.

5  Her husband is on basically his deathbed.  And he's going to be

6  the hand that helps her in preparing the home, not only

7  preparing the home, being there for his mother because she is

8  the only one that's working at the restaurant.

9      And so, Judge, we just ask the Court to consider that,

10 consider his family and also consider the fact that Mr. Ussery

11 himself approached law enforcement.  Mr. Ussery went to law

12 enforcement and said, Hey, there are threats against my life.

13     To say that he's going to go out there and harm an

14 individual with the federal government aware of what he's

15 doing, Judge -- the federal government is aware of what he

16 says, what his beliefs are, and he personally went to the FBI

17 to let them know, There are threats against me.

18     And, again, Mr. Ussery wants nothing more than to be given

19 an opportunity to confront these charges against him.  He would

20 like the opportunity to be there with his mother, his family.

21     And he is clearly, at this point, Your Honor, willing to

22 make any necessary changes that this Court would ask of him so

23 that he could be released on an unsecured bond.  He's not going

24 anywhere, Judge.  He's not going to threaten anyone because he

25 knows what he needs to do and what conditions he needs to abide

1  by.

2      And we believe this Court may set reasonable conditions,

3  giving him an electronic leg monitor, making sure he's nowhere

4  near the facility of Sutherland Springs, no posts directed to

5  the Sutherland Springs individuals, no potentially harassing

6  statements that may be perceived as that.  Limiting his

7  computer use, that's another condition that we can add to make

8  sure that he doesn't reach out to anyone else, Judge.  We're

9  just asking for the opportunity for Mr. Ussery to be there with

10 his family as he prepares to confront these allegations.

11      And, Judge, we believe there's sufficient evidence to

12 support that there are reasonable conditions that can be set

13 for Mr. Ussery, not only which were presented, Judge, but also

14 which were in the form of the proffer in the affidavits, Judge.

15 So we just ask for Mr. Ussery to be granted an unsecured bond,

16 Judge.

17          THE COURT:  All right.  Very well.  Thank you,

18 Mr. Lara.

19      All right.  Mr. Ussery, I think you understand, from what

20 the attorneys have been arguing, there's two things I have to

21 figure out in these cases.  One is, are there conditions I can

22 set which would assure -- reasonably assure your appearance in

23 court?  Second, are there conditions I can set which would

24 reasonably assure the safety of the community and any person in

25 the community?

1    Now, there's a statute I have to follow.  It's the Bail

2  Reform Act.  It sets out factors I have to consider in these

3  cases.  And the factors are as follows.  I have to consider the

4  nature of the offense, including whether it includes -- it's a

5  firearms offense; the weight of the evidence against the

6  person; the history and characteristics of the person,

7  including their character; physical, mental condition; family

8  ties; employment; financial resources; length of residence in

9  the community, community ties; but also past conduct with

10  regard to criminal history or drug or alcohol history; and

11  record of appearing in court; and whether the person was on

12  bond at the time of the current offense or arrest.  And so I'm

13  looking at all those factors.

14    Of course, you were on bond at the time of the arrest.  But

15  it's for the exact same -- it's for a closely-related offense.

16  So many times being on bond, when you're arrested for a new

17  offense, would be a basis to hold you right there.  I'm not

18  considering that in this case.  And that's because these are

19  clearly very closely related, the terroristic threat and the

20  firearm.  So I'm not considering that factor.

21    Also, you have long length of residence in the community.

22  And, in fact, the government has not argued really very

23  strongly that there are no conditions I could set which would

24  reasonably assure your appearance in court.  You have some

25  criminal history, sir, but there's not much evidence of you

1    having not appeared in court.

2        And so I believe that there would be conditions, including

3    some that your attorney has suggested, that would assure your

4    appearance in court.  So the issue I have to decide in this

5    cases comes down to one thing.  Can I establish conditions that

6    would reasonably assure the safety of the community given the

7    circumstances that we have here?

8        And we have two circumstances.  I think I pointed this out

9    to both attorneys.  We have the circumstance of what are --

10   been now charged as terroristic threats, and we have the

11   circumstance of possession of a firearm.  And there's actually

12   additional firearms, maybe a question as to whether or not you

13   owned those firearms.  But the evidence before me is that you

14   had access to those firearms.  We have those two factors

15   together, and that's what I'm considering.

16       In looking at those two factors, I don't know what

17   conditions I can set which would assure the safety of the

18   community because I have in front of me threats that were very

19   serious threats, threatening that someone would be hanged and

20   that you will urinate on their dead body.  That's the kind of

21   threat that's -- that's a very serious threat.  It's the sort

22   of threat that if it was in a written communication would be an

23   individual -- a separate crime here in the United States in

24   federal court.

25       And the same time as those threats are made, you're in

1   possession of a firearm.  And the fact that it's very clear

2   from the evidence that was presented to me that, in fact, you

3   knew you weren't supposed to be in possession of a firearm at

4   that time in the -- and so for those reasons, looking at those

5   two together, I don't know what conditions I'm going to set

6   that's going to assure the safety of the community from the

7   threats which are themselves a danger and the firearms which

8   could -- the fact that you're possessing a firearm when out

9   there -- that there's a threat of violence as well.

10      Now, I see that you're raising your hand, sir.  And I'm

11  happy to hear anything you'd like to say.  However, I always

12  counsel any defendant before me -- two things about it.  One is

13  you always should talk to your attorney before presenting any

14  evidence.  The other thing is, with all facts -- all cases

15  like -- this case and any other case, you know, the facts

16  are -- this is very early on in the case.  As your attorney's

17  mentioned, he hasn't even seen the entirety of the video that's

18  been mentioned.  There's a lot of other evidence that's going

19  to have to be taken into account in this case.  Mr. Lara will

20  tell you -- he's an experienced attorney.  He will tell you

21  that I always will reconsider my decision if additional

22  evidence is presented in front of me.

23      So if there is additional evidence as we go forward and you

24  want me to reconsider this decision, all Mr. Lara has to do is

25  file a motion with me.  But that's my ruling at this time.

1    But that being said, you do have a right to speak, sir.  I
2 will ask Mr. Lara to speak to you before you do that, sir.
3    (Discussion off the record)
4        THE DEFENDANT:  Yes, sir.  I just wanted to look you
5 in the eye, Your Honor, and say I want to get back to my animal
6 rescue.  Mother really needs me.  I give you my word, I would
7 never be a threat to anybody, ever.  I just want to do the
8 right thing, do good things.  I always have.  For 30 years I've
9 dedicated my life to those animals.  I just want to see them.
10 And I don't want to -- I want to be there before my stepfather
11 dies.
12        THE COURT:  All right, Mr. Ussery.  Thank you.
13        THE DEFENDANT:  Thank you.
14        THE COURT:  I'll consider the statements that you
15 made.  However, the ultimate -- and I should make very clear,
16 I'm not deciding your guilt or innocence of any offense.  The
17 thing I have to look at is the safety of the community for your
18 release.  And based on the evidence presented to me right now,
19 I'm not changing my decision.
20    However, I'll note that.  And as new evidence comes
21 forward, Mr. Lara, as I said, will know exactly how to present
22 anything that needs to be presented to me.  I retain
23 jurisdiction over this case to reconsider if necessary.  But
24 that's the Court's ruling at this time.
25    Ms. Wannarka, anything further from the government at this

1  time?

2          MS. WANNARKA:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Mr. Lara, anything further

4  from the defense at this time?

5          MR. LARA:  Nothing further, Judge.

6          THE COURT:  I have considered all these affidavits,

7  but I'm going to hand them back to you, sir, in case you need

8  them for further proceedings in this case.

9      We'll be in recess.

10  * * *

11      (Hearing adjourned at 11:16 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

     I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:   6/18/2018        /s/ Chris Poage
                         655 East Cesar E. Chavez Blvd., Suite G-65
                         San Antonio, TX  78206
                         Telephone:  (210) 244-5036