UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. 5:18-390-OLG-1 |
| | § | |
| | § | |
| v. | § | May 29, 2018 |
| | § | |
| ROBERT MIKELL USSERY | § | |
| | § | |
| DEFENDANT. | § | |

TRANSCRIPT OF PRELIMINARY HEARING
BEFORE THE HONORABLE HENRY J. BEMPORAD
MAGISTRATE COURT JUDGE

APPEARANCES:

For the Government:      SARAH WANNARKA, AUSA
                        Office of US Attorney
                        601 NW Loop 410, Suite 600
                        San Antonio, Texas 78216


For the Defendant:       GUILLERMO LARA
                        Law Office of Guillermo Lara Jr.
                        310 S. Saint Mary's St
                        St. 965
                        San Antonio, TX 78205


Produced by mechanical stenography; computer-aided
transcription

Leticia Ornelas Rangel, CSR

```
1                              INDEX

2                    DIR    CX    REDIR    RECX

3    GOVERNMENT'S WITNESS:

4    Kaityln O'Connell       4     11      21       23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (In open court)

2            THE COURT:  Good morning.  Please be seated.

3    Calling the case of SA:18-M-655.  That is the United States

4    of America versus Robert Mikell Ussery.  If I could have

5    announcement of counsel, please.

6            MS. WANNARKA:  Sarah Wannarka for the United

7    States.  Good morning.

8            THE COURT:  Good morning.

9            MR. LARA:  Guillermo Lara for the defendant, Judge.

10   Good morning.

11           THE COURT:  Good morning, Mr. Lara.  We are set for

12   preliminary and detention hearings at this time, as I

13   understand it.

14           MR. LARA:  That is correct, Judge.

15           THE COURT:  All right.

16           MR. LARA:  We are moving forward on both of them.

17           THE COURT:  All right.  Let me hear from the

18   government.

19           MS. WANNARKA:  Thank you, Your Honor.  The

20   government calls Special Agent Kaitlyn O'Connell to the

21   stand.

22           THE COURT:  All right.  Ma'am, come forward.  The

23   courtroom deputy will swear you in.

24           CASE MANAGER:  Do you swear or affirm, that the

25   testimony that you will give in the case before the Court, is

```
 1   the truth, the whole truth, and nothing but the truth?

 2            THE WITNESS:  I do.

 3            THE COURT:  Good morning.  You may proceed,

 4   Ms. Wannarka.

 5         KAITLYN O'CONNELL, GOVERNMENT'S WITNESS, SWORN

 6                    DIRECT EXAMINATION

 7   BY MS. WANNARKA:

 8   Q    Please tell the court your name.

 9   A    Kaityln O'Connell.

10   Q    How are you employed?

11   A    I am a special agent with ATF.

12   Q    Generally what are your duties?

13   A    We investigate federal firearms violations.

14   Q    Have you had the occasion to investigate a Robert

15   Mikell Ussery?

16   A    Yes, ma'am.

17   Q    Do you see him in the courtroom today?

18   A    Yes, I do.

19   Q    Can you please describe what he's wearing?

20   A    He has on a blue bennett and he's sitting next to the

21   defense.

22            MS. WANNARKA:  Your Honor, if the record will

23   reflect that she's identified Robert Ussery.

24            THE COURT:  The record will so reflect.

25
```

1   BY MS. WANNARKA:

2   Q    How did -- how did this defendant come on to law

3   enforcement radar?

4   A    Originally, from what I understand, the Wilson County

5   Sheriff's office had come in contact with him on different

6   occasions down in the Sutherland Springs area.  They had

7   come in contact with him when he was on different

8   properties, I believe, he received multiple trespassing

9   violations, warnings in different areas.

10  Q    And why was he down there?

11  A    He was down there trying to talk to people about his

12  news organization.

13  Q    And, specifically, with regards to Sutherland Springs,

14  what was he talking about down there?

15  A    He was talking to about the mass shooting from November

16  5th, last year.

17  Q    And what was he saying about it?

18  A    He believed that it didn't actually happen.  That it

19  was a hoax and that nobody was killed.

20  Q    In so doing, was he confronting the families of the

21  victims of Sutherland Springs?

22  A    Yes, ma'am.

23  Q    And, specifically, was he confronting the pastor of the

24  First Baptist Church of Sutherland Springs?

25  A    Yes, ma'am, on March, 5th.

```
1    Q    Right.  So how did ATF get involved?

2    A    We were notified by other law enforcement agencies

3    about what was occurring.

4    Q    The Texas Rangers in Wilson County?

5    A    Yes, ma'am.

6    Q    And so then did you have the occasion to meet with

7    Wilson County Sheriff's Department.

8    A    I did.

9    Q    And prior to meeting with them, had you learned or did

10   you believe that the defendant was a convicted felon?

11   A    Yes, at that time we believed that he was.

12   Q    And since then, have you confirmed that he is a

13   convicted felon prohibited from possessing firearms?

14   A    Yes, ma'am.

15   Q    Okay.  So when you met with Wilson County, is that when

16   you learned that there was a particular Go-Pro video?

17   A    Yes, ma'am.

18   Q    Okay.  So explain to the court how that fits in, what

19   that is.

20   A    So the one video that you're referring to was about a

21   private confrontation that happened on March 5th outside the

22   Sutherland Springs church with the pastor.  At one point,

23   Mr. Ussery walks back to his vehicle, takes a silver pistol,

24   semi-automatic striker fire, and places it under the floor

25   mat, which was seen on the video.
```

1    Q    Okay.  Well let's talk about the incident on March 5th.

2    You know of the incident because of your interaction with

3    law enforcement and because of a video that was made?

4    A    Yes, ma'am.

5    Q    And was this defendant actually wearing a Go-Pro camera

6    which was videoing, video taping the entire encounter?

7    A    Yes, he was.

8    Q    Okay.  So with all of the sources of your information,

9    tell the court what happened on March 5, 2018.

10   A    From reviewing the video, Mr. Ussery along with his

11   girlfriend Jodi Mann, known as conspiracy granny, went down

12   to the area of Sutherland Springs church with the Vice news

13   group and they were working on what appeared to be a

14   documentary.  They then continued, they interacted with the

15   pastor which created an escalating confrontation.

16   Q    Okay.  Where did this confrontation occur?

17   A    On the property of the Sutherland Springs church.

18   Q    And what type of confrontation ensued between this

19   defendant and the pastor?

20   A    It started off as a conversation and then escalated.

21   Q    A conversation about what?

22   A    About the shooting at the Sutherland Springs church.

23   Q    And what was this defendant saying about that?

24   A    He was saying that it was a hoax and that nobody was

25   killed, to the pastor and one of the other church members.

1    Q    And, in fact, didn't the pastor lose a daughter in the
2    shooting?
3    A    He did.
4    Q    Describe the tone that this defendant approached the
5    pastor with.
6    A    It was confrontational and then became threatening
7    towards the end of the video.
8    Q    Did he use curse words towards the pastor?
9    A    Yes, ma'am.
10   Q    And, then, was there actually a part where the
11   defendant told the pastor that the people would hang him for
12   perpetrating the hoax?
13   A    Yes, ma'am.
14   Q    Tell the court about that.
15   A    At that point in the conversation, Mr. Ussery was
16   talking to the pastor and with his voice raised using curse
17   words, saying that the people were going to hang him and
18   then he would piss on them, he would piss on him in the way.
19   Q    The defendant would urinate on the pastor after he was
20   hung?
21   A    Yes, ma'am.
22   Q    All right.  So then during this time was the other
23   church member that was there, had he reached out to Wilson
24   County to call the police?
25   A    Yes, ma'am, he did.

1   Q    Now had the defendant and his girlfriend, Conspiracy

2   Granny, had they been previously trespassed from that church

3   property?

4   A    It was on that day.

5   Q    That day?

6   A    Yeah.

7   Q    And when the Wilson County Sheriffs came, what help --

8   what was that encounter like?

9   A    It was aggressive.  Mr. Ussery stated that he would

10  have them arrested on federal charges, and then eventually

11  led to his arrest.

12  Q    What was he eventually arrested for that day?

13  A    He was arrested for resisting arrest, criminal

14  trespassing, possession of marijuana, less than two ounces,

15  and terroristic threat causing fear of imminent serious

16  bodily injury.

17  Q    And was Conspiracy Granny also arrested that day?

18  A    She was.

19  Q    Subsequent to that, did Wilson County seize the Go-Pro

20  camera that the defendant was wearing, get a search warrant

21  and watch it?

22  A    Yes, ma'am.

23  Q    And is that how you have a video of this confrontation?

24  A    Yes.

25  Q    As well as the defendant possessing the firearm?

```
 1   A    Correct.

 2   Q    Now you said that the firearm the defendant possessed

 3   is a striker fire?

 4   A    Yes, ma'am.

 5   Q    And we know that those were never made in Texas; is

 6   that correct?

 7   A    Correct.

 8   Q    So it had been transferred in interstate or foreign

 9   commerce?

10   A    Yes, ma'am.

11   Q    Was there a portion on the video when the defendant was

12   in his truck and had placed the gun under the floor mat,

13   that he tried to disavow himself of the weapon.

14   A    Yes, ma'am.

15   Q    Tell the court about that.  And as you are looking for

16   that part in the complaint, this conversation happened

17   before Wilson County came and arrested him; is that correct?

18   A    Yes, ma'am, it is.

19   Q    Okay.

20   A    So this is what I had gathered from the video:  They

21   were just getting to the vehicle, Conspiracy Granny said, "I

22   hear sirens."

23        Mr. Ussery said, "Good.  We don't have any stickers

24   on this car, and it's freezing."

25        Granny said, "I know."
```

Leticia Ornelas Rangel, CSR

1              Mr. Ussery then said, "The gun's under the mat so

2      that's yours."

3      Q    And did that statement come after you were able to

4      visibly see him place the pistol under the floor mat?

5      A    Yes, ma'am.

6      Q    And then did he later also repeat, "The gun is under

7      the floorboard"?

8      A    Yes, ma'am.

9              MS. WANNARKA:  I'll pass the witness.

10             THE COURT:  All right.  Mr. Lara, you may inquire.

11             MR. LARA:  Thank you, Judge.

12                          CROSS EXAMINATION

13     BY MR. LARA:

14     Q    Agent O'Connell, I have a few question for you.  You

15     indicated that the reason that you were called -- or Mr.

16     Ussery was draw -- drew your attention, was that Wilson

17     County Sheriff's department had spoken to you or called you

18     about it?

19     A    I believe they actually contacted the Rangers first

20     then we were contacted that way.

21     Q    Okay.  So from the Rangers, you indicated -- and so the

22     information that you received from the Rangers was that he

23     received multiple trespass warnings; is that correct?

24     A    From what I understand there's -- yeah.

25     Q    And do you know when he received these trespass

1    warnings?

2    A    I do not.

3    Q    Do you know how many in fact he actually received?

4    A    No, sir.

5    Q    Would it surprise you that the only warning that he

6    received was on that date in March of 2018?

7    A    I don't have any specific knowledge that it has the

8    dates.

9    Q    Okay.  But you do have access to the Go-Pro in this

10    case, right?

11    A    Yes, sir.

12    Q    And, in that Go-Pro, how many times does he asked not

13    to be on the property of the church?

14    A    I don't recall.

15    Q    Would it surprise you that it was only one time that he

16    asked not to be in that property and he removed himself?

17    A    I don't recall the specifics of that.

18    Q    Okay.  But you did watch the video, though, right?

19    A    Yes, sir.

20    Q    And so as far as the trespass warnings that he

21    received, is the street also property belonging to the

22    church?

23    A    I don't know the specifics of the -- who owns the

24    property.

25    Q    Okay.  Now, you indicated that Mr. Ussery had spoken

1   with the pastor on that date in March; is that correct?

2   A    In front of the church on the video from what -- that

3   is the only part that I know about.

4   Q    Okay.  And so from the part that you know about, when

5   he's speaking to the pastor, you said it didn't start off as

6   a confrontational discussion; is that right?

7   A    It started off pretty mild.

8   Q    Pretty mild.  Okay.  Did you see in that video

9   Mr. Ussery waving a handgun in the face of the pastor?

10   A    No, sir.

11   Q    Was he placing his hands on the pastor?

12   A    No, sir.

13   Q    In fact, he was only using words; is that right?

14   A    Correct.

15   Q    Okay.  And are words alone -- well let me ask you this:

16   So in terms of confronting the families, I believe you

17   testified, who did he specifically confront in Sutherland

18   Springs?

19   A    The person that I know is Pastor Pomeroy.

20   Q    So it's only one person then, right?

21   A    I don't know the names of the other people.

22   Q    Okay.  So when you said that he was confronting the

23   families, you don't have any specific knowledge that that

24   actually took place?

25   A    No, sir.  I'm relying on other law enforcement.

1   Q    Okay.  So do you know when these other confrontations

2   took place?

3   A    Not specifically.

4   Q    Okay.  And do you know the number of times that

5   Mr. Ussery confronted anyone?

6   A    No, sir.

7   Q    So we're really here on just one allegation of

8   harassment, correct, of one, of one of the citizens of

9   Sutherland Springs?

10  A    Yes, sir.  That's what I have knowledge of.

11  Q    Okay.  Now, you indicated that the Go-Pro video that

12  you watched was obtained through a warrant that was issued

13  from the Wilson County Sheriff's department; is that

14  correct?

15  A    Yes, sir.

16  Q    Now, what was the basis and the probable cause for

17  getting into that video camera?

18  A    That it was taken while he was arrested.

19  Q    I'm sorry?

20  A    Search into -- search incident to arrest.  And that it

21  had supporting documentation of what had occurred that day.

22  Q    So it's possible that that may not even be admissible

23  evidence, would you agree?

24  A    That's not my decision.

25  Q    Would you agree that that's possible?

1    A    That's not my decision.

2    Q    Now, you indicated that you witnessed Mr. Ussery grab a

3    handgun and place it under the floorboard?

4    A    Yes.

5    Q    Did you skip over the beginning portions of that video

6    to just get and focus on that section of it?

7    A    No, sir.  I watched the whole video.

8    Q    Okay.  And with respect to the interaction that he had

9    with the pastor, I believed that you already testified that

10   he did not wave that handgun at the pastor, is that correct?

11   A    Correct.

12   Q    Did anyone know that Mr. Ussery was in possession of a

13   firearm, if that was true, in fact, that he was in

14   possession of a firearm?

15   A    Part of that is still under investigation.

16   Q    Okay.

17         THE COURT:  Wait a second I lost you there,

18   Mr. Lara.

19         MR. LARA:  Yes, and I believe that was a very

20   horrible question, Judge.  It was (laughter)

21         THE COURT:  No, no, no.  I think, your question was

22   good.

23         Ms. O'Connell, didn't she that it sounded like from

24   the interchange on there that Ms. Mann knew about it because

25   they talked about it.

---

Leticia Ornelas Rangel, CSR

1          THE WITNESS:  Yes, sir.  Yes, sir.

2          THE COURT:  All right.  But, I gather, Mr. Lara,

3   you're talking about other people, like the people in the

4   community or--

5          MR. LARA:  Right.

6          THE COURT:  -- like if they knew about it.

7          MR. LARA:  Just the past -- the pastor or the other

8   church member that was there, if either one of them knew that

9   Mr. Ussery--

10         THE COURT:  Oh, I see.

11         MR. LARA:  -- could have been in possession of a

12  firearm.

13         THE COURT:  Well, we don't know the name of the

14  other person.

15         MR. LARA:  That's correct, Judge.

16         THE COURT:  That's why I'm confused.

17         MR. LARA:  That's correct.

18         THE COURT:  Okay.  All right.  I got you.  I'm with

19  you now.  I'm sorry, ma'am.  I lost between y'all on that

20  issue.  Go ahead.

21  BY MR. LARA:

22  Q    And do you know that, if either the pastor or the other

23  constituent of the church were aware that he may be in

24  possession of a firearm?

25  A    I don't have any information on that.

1    Q    Okay.  Now with respect to the commentary that you

2    described was that Mr. Ussery specifically told the pastor

3    that, and please correct me if I'm wrong, that the people

4    would hang him for the hoax, is that right?  Is that

5    accurate?

6    A    Yes.

7    Q    Okay.  That's no Mr. Ussery; is that right?

8    A    I'm sorry.

9    Q    So he said -- what the statement was was that the

10   people would hang him for the hoax.  Is that accurate?

11   A    Yes.

12   Q    All right.  Mr. Ussery didn't say, I will hang you for

13   this hoax?

14   A    Correct.

15   Q    Okay.  Now when you indicated that Mr. Ussery was

16   confrontational, did the entire confrontation take place in

17   front of this church?

18   A    In or around that general area.

19   Q    Okay.  And were you aware if the church themselves

20   requested a restraining order to prevent Mr. Ussery from

21   going back to the church?

22   A    I am unaware of that?

23   Q    Would you be surprised that there is a restraining

24   order in place?

25   A    I wouldn't be surprised.

1    Q      Okay.  And would you be surprised that Mr. Ussery has

2    not been back to that church since receiving that

3    restraining order?

4    A      I don't have any knowledge of that, if he was there or

5    not.

6    Q      Now, with respect to the warnings that he was given, do

7    you know if they were oral or were they written?

8    A      For what incident?

9    Q      The warnings for not being present at the church's

10   property.

11   A      You mean on March 5th?

12   Q      Yes, that's correct.

13   A      I believe they were verbal.

14   Q      Okay.  Now, did you -- did you have an occasion to

15   speak with Mr. Ussery prior to his arrest on this federal

16   charge?

17   A      Not prior to.

18   Q      Okay.  Now, were you aware that on the day that he was

19   arrested for this federal charge, he was in route to the

20   Caldwell County Justice Center?

21   A      Yes, sir.  That's where he was arrested.

22   Q      And why was he arrested there?

23   A      It's where we chose to arrest him.

24   Q      Was there was any specific planning that took place to

25   get Mr. Ussery there?

1    A    There's always planning for operations.

2    Q    Okay.  So, in fact, someone from the Caldwell County

3    called Mr. Ussery, told him to be present at 11:00 o'clock

4    to discuss threats that he had -- the threats that had been

5    made on his life; is that correct?

6    A    To my knowledge, yes.

7    Q    Okay.  So, in fact, he -- and isn't it correct that

8    Mr. Ussery contacted law enforcement because he was afraid

9    and feared for his life?

10   A    From what I understand.

11   Q    Okay.  And you would agree with me that he actually

12   went down to the FBI office to let them know, hey, there are

13   threats against my life, right?

14   A    Yes, I am aware of that.

15   Q    Okay.  And on this day -- law enforcement didn't have

16   to look for Mr. Ussery; is that right?

17   A    I don't understand your question.

18   Q    So Mr. Ussery voluntarily transported himself at the

19   request of Caldwell County law enforcement to be present

20   there; is that correct?

21   A    From what I understand, it was not law enforcement that

22   called him.

23   Q    And who was it that called him?

24   A    I believe it was the District Attorney's Office.

25   Q    Okay.  And do you know -- was it to discuss the case

1   that he had filed against the threats he received?

2   A    From what I understand.

3   Q    Okay.  Now when -- you were part of this arrest.  Did

4   Mr. Ussery attempt to flee at any point?

5   A    No, sir.

6   Q    Did he -- did he fight anyone when he was being placed

7   under arrest?

8   A    Not from what I was told.

9   Q    Okay.  Did he make threats to you or anyone else in law

10  enforcement at the time of his arrest?

11  A    Not that I have heard of.

12  Q    Would you agree with me that he was cooperative?

13  A    Yes, sir.

14  Q    In fact, he handed you keys and other belongings, is

15  that correct, so that you could continue your investigation.

16  Is that right?

17  A    Yes, sir.  We asked for them.

18  Q    Okay.  And he was very compliant with that; is that

19  right?

20  A    He was.

21  Q    Okay.  Do you believe he's a, he's a flight risk?  Do

22  you know if he has a passport?

23  A    I don't know his personal history.

24  Q    Okay.  Do you know if he has a passport?

25  A    I do not know.

1    Q    All right.  Do you believe that he's gonna flee from --

2    from these charges?

3    A    I don't know him well enough to give an answer to that.

4    Q    Okay.  And do you believe that, again, if he's abiding

5    by the restraining order, which is in effect in Caldwell

6    County, that would protect the citizens of Sutherland

7    Springs?

8    A    Again, that's not my decision.

9         MR. LARA:  No further questions, Judge.  Pass the

10   witness.

11        THE COURT:  All right.  Very well.  Yes,

12   Ms. Wannarka?

13                    REDIRECT EXAMINATION

14   BY MS. WANNARKA:

15   Q    You mentioned an operation, that there was an operation

16   that led to the defendant's request.  Was it a goal to

17   arrest him away from his property where he lives?

18   A    Yes, ma'am.

19   Q    And he lives in Caldwell County?

20   A    He does.

21   Q    And did you want to arrest him away from the property

22   because you were gonna be executing a search warrant at his

23   residence?

24   A    Yes, ma'am.

25   Q    And did you in fact execute or did ATF and law

1   enforcement execute a search warrant at his residence?

2   A    Yes, we did.

3   Q    What did you find of note?

4   A    In summary, we found ten firearms, one of which was a

5   50 Cal 2AR-type rifles.

6   Q    You said you found ten firearms?

7   A    Yes, ma'am.

8   Q    One of which was a what?

9   A    A .50 Caliber Rifle.

10  Q    A .50 Caliber Rifle, what else?

11  A    2AR-type Rifles. I believe a couple of shotguns and

12  pistols.

13  Q    Did you find any rounds of ammunition?

14  A    Yes, ma'am.

15  Q    How much?  Approximately, how many rounds?

16  A    Approximately, close to a thousand rounds.

17  Q    Are you aware of any of these death threats that have

18  been made against the defendant and why they've been made

19  against the defendant?

20  A    I have heard of them. I've never witnessed any of them.

21  Q    And what is it that you've heard?

22  A    I've heard that he was making threats against some of

23  the victims and threatening them.

24  Q    And then they were threatening him back?

25  A    Yes, ma'am.

1   Q     Thank you.

2             MS. WANNARKA:  I'll pass the witness.

3             THE COURT:  All right.  I have one question that

4   I'd like to impart.  You mentioned a search that was of the

5   Go-Pro.  I gather there was no search of that vehicle that

6   Mr -- that you mentioned Mr. Ussery was in, that's the one

7   where I think that you saw the Go-Pro.  Is that like a Tahoe?

8             THE WITNESS:  It was a chevy pickup truck.

9             THE COURT:  No, a white chevy pickup truck.  Yeah,

10  there wasn't a -- to your knowledge, was there a search of

11  the vehicle?

12            THE WITNESS:  I believe there was like a

13  preliminary search but not an in depth search.

14            THE COURT:  Okay.  All right.  That was my only

15  question.  Of course, Mr. Lara, you can inquire about the

16  matters that Ms. Wannarka went into.

17            MR. LARA:  Okay.

18            THE COURT:  And, of course, the question I just

19  asked as well.

20            MR. LARA:  Sure.

21                      RE-CROSS EXAMINATION

22  BY MR. LARA JR:

23  Q     Just a few question on that.  So you attempted to

24  effectuate a search of Mr. Ussery's property; is that

25  correct?

1    A    Yes.

2    Q    And you indicated that there was some firearms in his

3    place of residence.

4    A    Yes, sir.

5    Q    Okay.  Now through your investigation, did Mr. Ussery

6    threaten anyone with these firearms?

7    A    Not that I'm aware of.

8    Q    Okay.  And you're aware of the fact that Mr. Ussery,

9    even though he may have a prior conviction, he is allowed to

10   have a firearm in his home, is that -- do you know that?

11   A    Not under federal law, under federal guidelines.

12   Q    But under Texas law he's allowed to do that, though,

13   right?

14   A    I don't know the Texas law enough to be able to answer

15   you.

16            MR. LARA:  No further questions, Judge.

17            THE COURT:  All right.  Anything else,

18   Ms. Wannarka?

19            MS. WANNARKA:  No, Your Honor.

20            THE COURT:  All right.  Thank you, ma'am.  I'm

21   going to excuse the witness then.

22            Ms. Wannarka, any other witness you'd like to

23   present on the issue of probable cause?

24            MS. WANNARKA:  No, Your Honor.

25            THE COURT:  All right.  Mr. Lara, I'm happy to hear

1   you.  Is there any evidence you'd like to present with regard

2   to the probable cause question?

3            MR. LARA:  No, Your Honor.  No probable cause.

4            THE COURT:  All right.  Any argument the parties

5   would like to make, I'm happy to hear it.

6            MS. WANNARKA:  Not from the government.

7            THE COURT:  All right.  Mr. Lara, do you want to

8   raise any argument with regard to the question of probable

9   cause in the case?

10           MR. LARA:  Judge, I believe there's issues that --

11   that will be better served in another hearing.

12           THE COURT:  Excellent.  All right.

13           MR. LARA:  With respect to the video footage which

14   is the basis of this, of this allegation, actually.

15           THE COURT:  Well, Mr. Lara, that reminds me, I was

16   going to inquire, have you received a copy of the -- have you

17   seen the entirety of this footage?

18           MR. LARA:  I have not, Judge.  I have not.

19           THE COURT:  You.  Okay.  All right.  Very well.

20           MR. LARA:  Thank you, Judge.

21           THE COURT:  All right.  Well, thank you.  All

22   right.  Well based on the representation of the party, I find

23   probable cause for the case to go forward, however, Mr. Lara,

24   when you this clearly Ms -- the testimony presented to me was

25   based on this video.  If upon your review of the video,

1    there's an issue that you need to raise with the court with

2    regard to the preliminary examination, I will reconsider at

3    that time, once you got an opportunity to watch the entirety

4    of the video.

5              MR. LARA:  Thank you, Judge.

6              THE COURT:  All right.  Now let's turn to the

7    question of detention in the case.  Ms. Wannarka, I will

8    consider the agent's testimony on the issue of detention and

9    release.  I also have before me a pretrial services report.

10   Have you reviewed that report?  Do you have any objections or

11   corrections to that report?

12             MS. WANNARKA:  I haven't viewed the report.  I

13   don't have any changes or corrections.

14             THE COURT:  All right.

15             MS. WANNARKA:  And I don't have any additional.

16             THE COURT:  All right.  Very well.  Let me then

17   turn to you, Mr. Lara.  Have you had a chance to review this

18   report with your client, and do you have any corrections or

19   objections to the report?

20             MR. LARA:  Yes, we have reviewed the report, Judge.

21             THE COURT:  All right.

22             MR. LARA:  The only issue that we had, Judge, was,

23   was -- one of the, one of the allegations with respect to an

24   issue on Page 5, Judge.  The bottom of that page.

25             THE COURT:  All right.  Let me, okay, hold on a

```
 1    second.  All right.  I'm with you.  Yes, sir.

 2              MR. LARA:  It's a case out of Brazoria County.

 3              THE COURT:  Mmm hmm.

 4              MR. LARA:  Alleging and evading arrest.  I was

 5    speaking with my client about this offense.  He doesn't seem

 6    to recall this, whether or not there was any type of a

 7    sentence actually imposed in this case.

 8              THE COURT:  I see.

 9              MR. LARA:  So we'd like to look into that further,

10    Judge.

11              THE COURT:  All right.  Well it's -- it's over 20

12    years old.  It's not something that I would be likely to

13    consider in making the determination as to detention or

14    release, so I'm not gonna particularly rely on that one,

15    though it is an evading arrest conviction.  That is something

16    that kind of matters to the court.  I won't consider that at

17    this time.  So--

18              MR. LARA:  Thank you.

19              THE COURT:  -- however, if the parties need to

20    present more information on that at a later time, I'll

21    consider it.

22              MR. LARA:  Thank you, Judge.

23              THE COURT:  All right.  You may proceed.

24              MR. LARA:  I believe that was the only issue that

25    we have with respect to the --
```

Leticia Ornelas Rangel, CSR

1          THE COURT:  All right.  Well, with that one

2    exception, I will consider then the pretrial services report.

3    And let me ask you, Mr. Lara, whether there's any additional

4    evidence you would like to present by way of proffer or

5    witness at this time?

6          MR. LARA:  Judge, the only evidence that we

7    present, we'd like to present three affidavits, Judge, in a

8    way of proffer for the court's consideration.  I will hand

9    them to the government for objection.

10          THE COURT:  All right.

11          MR. LARA:  They are affidavits from Edith Galuhe

12   (phonetic) Mr. Ussery's mother.

13          THE COURT:  All right.

14          MR. LARA:  As well as Jodi Mann and Mr. Ussery

15   himself.

16          THE COURT:  All right.  Very well.  I think

17   Ms. Mann was in the courtroom.  I don't know is she's still

18   in the courtroom, and I don't know about the Mr. Ussery's

19   mother's.  Is she --

20          MR. LARA:  No, she's not.  She's actually ill,

21   Judge.

22          THE COURT:  All right.

23          MR. LARA:  She's actually -- I'll let the court

24   know.

25          THE COURT:  All right.  Very well.

1          MS. WANNARKA:  I don't have any objection, if you

2    are offering this into evidence--

3          THE COURT:  All right.  Then let me, well --

4          MS. WANNARKA:  -- for this hearing.

5          THE COURT:  All right.  Very well.  If you will

6    present them to my courtroom deputy.  Let me just review

7    them.

8          MR. LARA:  Yes, sir.

9          THE COURT:  See if I have any questions that I need

10   to inquire of with regard to the proffer.  All right.  I'm

11   happy to accept the proffers as made.  I don't think I need

12   any questions of either Mr. Ussery or Ms. Mann or

13   Mr. Ussery's mother who obviously is too ill to attend.

14         MR. LARA:  Yes.

15         THE COURT:  I'll consider all these, all the

16   affidavits as presented.

17         MR. LARA:  Thank you, Judge.

18         THE COURT:  All right.

19         MR. LARA:  And she did say she was available by

20   phone should the court need to reach her.

21         THE COURT:  I don't think I need any inquiries, and

22   it doesn't sound like the government needs too either.  So

23   I'm going to consider all this evidence.

24         MR. LARA:  Thank you, Judge.

25         THE COURT:  All right.

1          MR. LARA:  Aside from that, Judge, I just want to

2    make a point, I know Mr. Ussery did relay to me when the

3    agent testified that none of those firearms are actually his

4    firearms.  He's been on that property for the past ten years,

5    as the affidavit shows.  And so that was something that was

6    there with respect to, with respect to the home that he lives

7    in there on that prop -- on that in, let's see, I believe the

8    property's address is 464 Payne Lane, is what it was, Judge.

9          THE COURT:  Yeah, that's the address that is

10   included in the pretrial services report. And I don't know if

11   it was -- I may have missed it in the Mr. Ussery's affidavit.

12   Were those under some sort of lock and key?  Where -- do you

13   have information as to where those firearms were?  I don't

14   think the agent knew about it and didn't get into that.  But

15   it may be, Ms. Wannarka you can tell me, too.

16         MS. WANNARKA:  I just didn't ask her.

17         THE COURT:  I understand. That's fine.  That's

18   fine.

19         MS. WANNARKA:  And just for the sake of time, I

20   think if she were to testify again she would say, that many

21   of them were in the living area in the area where Mr. Ussery

22   lived, sitting there, unlocked.

23         THE COURT:  That's what I was wondering, if there

24   was like a locker.

25         MS. WANNARKA:  And available.

1          THE COURT:  Sometimes they have lockers and stuff

2    like that.

3          MS. WANNARKA:  Some were.  Some were in a conex

4    container.

5          THE COURT:  What's a conex?  I'm sorry.

6          MS. WANNARKA:  Like a storage unit on the property.

7          THE COURT:  Oh, I see.  Okay.

8          MS. WANNARKA:  But others were, were readily open

9    in his living area.

10          THE COURT:  All right.  I'll see if there's much of

11    a dispute on this.  Mr. Lara, is that approximately correct?

12    There's some in the area.  Then -- according to Mr. Ussery

13    they didn't belong to him but they were in that area and some

14    were in a locker.  I mean, a storage compartment.  A storage

15    compartment,

16          MR. LARA:  Yes, Judge.  Just with the added, added

17    fact that the building is double locked in the front door

18    with respect to the entrance where the, where the firearms

19    were.

20          THE COURT:  Mr. Ussery's home or the -- that, that

21    storage container?

22          MR. LARA:  Yes, yes, Judge.

23          THE COURT:  Maybe both.

24          MR. LARA:  Both containers?

25          DEFENDANT USSERY:  Both.

1          MR. LARA:  Both, Judge.

2          THE COURT:  All right.  I'll accept -- I'm gonna

3    accept all that.  That -- this sounds like there wasn't much

4    of a dispute about that.  I'm gonna accept all this into

5    evidence.  Thank you very much.  Now, I will consider all

6    that proffer.

7          Let me then hear from the government on the

8    question of detention to release.

9          MS. WANNARKA:  Thank you, Your Honor.  The

10   government's asking that the defendant be detained pending

11   trial in this matter.  And, really, it's really it comes down

12   to him being a danger to the community.  And more

13   specifically he is a danger to the Sutherland Springs

14   community.  He has terrorized them, multiple people, most

15   specifically Pastor Pomeroy on a number of occasions in

16   threatening, ugly confrontational manners.

17          You know, it's one thing to believe something,

18   quite frankly that's outrageous.  The fact that that

19   Sutherland Springs shooting is a hoax is utterly lud -- to

20   think that is ludicrous.  That's fine.  In this world he can

21   think that.  But what makes him dangerous is that he went and

22   confronted people.  This incident isn't even -- it's only

23   been six months.  On May -- on March 5th it had been six

24   months.

25          People were healing.  People were still upset.  And

1    he found it necessary to go and confront these people.  And

2    Pastor Pomeroy didn't just lose his daughter, he lost a

3    majority of his church.  So to go and spew hate and, and just

4    ugly confrontational words for no reason at all, makes him a

5    danger.  And the fact that he is prohibited from carrying

6    weapons and had one when he was down confronting the pastor

7    and had multiple weapons at his home at his disposal -- he's

8    not charged with felon and ownership of a firearm.  He's

9    charged with felon in possession of a firearm.  And he

10   absolutely had control, management, over all of those high

11   power, large capacity weapons with enough ammo to do a lot of

12   damage.  And for those reasons, we believe he is absolutely a

13   danger to this community.

14          And I don't think there are conditions for somebody

15   like this that would keep him, keep the community safe and

16   keep that community of Sutherland Springs from having to look

17   over their shoulder for him.  Thank you.

18          THE COURT:  I had one, let me just make sure I'm

19   understanding one part of your argument.  Well, there's one

20   part is that the guns present a danger because they can be

21   used violently against persons.  But I think your

22   understanding -- your argument is also that the threats

23   themselves are that -- and that the confrontations themselves

24   are in fact endangering and victimizing people in Sutherland

25   Springs and that's one of the conditions.  One of the things

1    that you're worried about.

2            MS. WANNARKA:  Absolutely, Your Honor.

3            THE COURT:  I understood it would be both of those

4    arguments?

5            MS. WANNARKA:  Yes, Judge.

6            THE COURT:  All right.

7            MS. WANNARKA:  Because he had repeatedly gone back

8    down to that community and approached different people.

9    They -- they're scared of him.

10           THE COURT:  All right.  Very well.

11           Mr. Lara, let me hear from you, sir.

12           MR. LARA:  Yes, Judge.

13           THE COURT:  And I tried to clarify, because I would

14   like to address both of those issues.

15           MR. LARA:  Yes.

16           THE COURT:  As I understand the government's

17   argument.

18           MR. LARA:  Yes, Judge.  Judge, it's our position

19   that the government hasn't proven by clear and convincing

20   evidence that no conditions will reasonably assure the safety

21   of the community.  Now, if, if, looking at the argument with

22   respect to the firearms, there are conditions that can be set

23   to assure that Mr. Ussery will not be in possession of any

24   firearms.

25           And that's something that could be addressed by

1    this court.  Not only that, Judge, with respect to the

2    instant case, the perceived dangerousness to the community is

3    a risk that Robert will engage and continue harassment,

4    threats, while pending trial for this offense.  The record

5    doesn't support that conclusion.  With respect to the

6    evidence that was presented by the agent, whether or not

7    there was one instance of harassment, which was alleged, we

8    don't have any support to indicate that he was there on

9    multiple, multiple occasions.

10            Now the restraining order was in effect and

11   Mr. Ussery has abided by that.  So, clearly, he understands

12   that he's gonna abide by that and not bother these

13   individuals and co -- and continue to go back to that

14   location.

15            THE COURT:  Mmm hmm.

16            MR. LARA:  So there is an ability and there is a

17   possibility to keep him away from them.  Not only that,

18   Judge, Mr. Ussery through his proffer has indicated to this

19   court that he is willing to just take it all down, make sure

20   that he wants to move forward with his life.  He's lived in

21   this residence in Texas for his entire life.

22            He -- no evidence has been presented that he had a

23   firearm, was brandishing a firearm and threatening this

24   pastor.  Now, now, there's some issues that were there,

25   Judge.  But we don't believe that the evidence has been

1   provided to support that he's a threat to the community.

2          Now, again, Judge, with respect to his previous

3   cases, Judge, which the court has, you know, older, older

4   cases which have been presented to the court.

5          THE COURT:  Mmm hmmm.

6          MR. LARA:  He's always appeared.  He's never --

7   it's never been an issue with him failing to appear.  He's

8   completed probation successfully in the past.  His mother

9   supports him.  And he is going to live with her should this

10  court grant him a bond, and she really needs him right now.

11  As the affidavit shows, she's going through an extremely

12  tough time right now.

13         Her husband is on, basically, his death bed.  And

14  he's gonna be the hand that helps her in preparing the home.

15  Not only preparing the home, being there for his mother,

16  because she is the only one that is working at the

17  restaurant.  And, so, Judge, we just ask the court to

18  consider that.  Consider his family and also consider the

19  fact that Mr. Ussery himself approached law enforcement.

20         Mr. Ussery went to law enforcement and said, hey,

21  there are threats against my life.  He -- to say that he's

22  gonna go out there and harm an individual with the federal

23  government aware of what he's doing, Judge -- the federal

24  government is aware of what he says, what his beliefs are,

25  and he personally went to the FBI to let them know there were

1  threats against him.  And, again, Mr. Ussery wants nothing

2  more than to be given an opportunity to confront these

3  charges against him.

4          He would like the opportunity to be there with his

5  mother, his family.  And he's clearly, at this point, Your

6  Honor, willing to make any necessary changes that this court

7  would ask of him so that he could be released on an unsecured

8  bond.  He's not going anywhere, Judge.  He's not going to

9  threaten anyone because he knows what he needs to do and what

10  conditions he needs to abide by, and we believe this court

11  may set reasonable conditions, giving him an electronic leg

12  monitor, making sure he's nowhere near the facility of

13  Sutherland Springs.  No posts directed to the Sutherland

14  Springs individuals.  No, no, potentially harassing

15  statements that may be perceived as that.  Limiting his

16  computer use, that's another condition that we can add to

17  make sure that he doesn't reach out to anyone else, Judge.

18  We're just asking for the opportunity for Mr. Ussery to be

19  there with his family as he prepares to confront these

20  allegations.

21          And, Judge, we believe there's sufficient evidence

22  to support that there are reasonable conditions that can be

23  set for Mr. Ussery, not only which we've presented, Judge,

24  but also which were in the form of the proffer and the

25  affidavits, Judge.

1          So we just ask for Mr. Ussery be granted an

2    unsecured bond, Judge.

3          THE COURT:  All right.  Very well.  Thank you,

4    Mr. Lara.  All right, Mr. Ussery, I think you understand from

5    what the attorneys have been arguing, there's two things I

6    have to figure out in these cases.  One, is are there

7    conditions I can set which would assure, reasonably assure

8    your appearance in court.  Second, are there conditions I can

9    set which would reasonably assure the safety of the community

10   and any person in the community.

11         Now there's a statute I could follow.  It's the

12   Bail Reform Act.  It sets out factors I could consider in

13   these cases.  And the factors are as follows:  I have to

14   consider the nature of the offense involve -- including

15   whether it includes, it's a firearm's offense.  The weight of

16   the evidence against a person, the history and

17   characteristics of the person, including their character,

18   physical, mental condition, family ties, employment,

19   financial resources, length of residence in the community,

20   community ties.  But also past conduct with regard to

21   criminal history or drug or alcohol history and record of

22   appearing in court and whether the person was on bond at the

23   time of the current offense or arrest.

24         And so I'm looking at all those factors.  Of course

25   you were on bond at the time of the arrest, but it's for the

1    exact same, it's for a closely related offense.  So many

2    times being on bond when you're arrested for a new offense

3    would be a basis to hold you right there.  I'm not

4    considering that in this case.

5              And that's because it's -- these are clearly very

6    closely related, the terroristic threat and the firearm.  So

7    I'm not considering that factor.  Also, you have long length

8    of residence in the community.  And, in fact, the government

9    has not argued really very strongly that there are no

10   conditions I could set, which would reasonably assure your

11   appearance in court.

12             You have some criminal history, sir.  But there's

13   not much evidence of you having not appeared in court.  And

14   so I believe that there would be these conditions, including

15   some that your attorney has suggested, that would assure your

16   appearance in court.

17             So the issue I have to decide in this case comes

18   down to one thing:  Can I establish conditions that would

19   reasonably assure the safety of the community and given the

20   circumstances that we have here.

21             And we have two circumstances:  I think I pointed

22   this out to both attorneys.  We have the circumstance of what

23   are the -- the now charge is terroristic threats.  And we

24   have the circumstance of possession of a firearm.

25             And there's actually additional firearms, maybe a

1    question as to whether or not you own those firearms but the

2    evidence before me is that you had access to those firearms.

3    We have two factors together.  And that's what I'm

4    considering.  In looking at those two factors, I don't know

5    what conditions I can set which would assure the safety of

6    the community because I have in front of me threats that were

7    very serious threats.  Threatening that someone would be

8    hanged and that you would urinate on their dead body.  That's

9    the kind of threat, that's a very serious threat.

10           The sort of threat, if it was in a written

11   communication, would be an individual -- a separate crime

12   here in the United States in a federal court.  And at the

13   same time as those threats were made, you are in possession

14   of a firearm.  And the fact that it's very clear from the

15   evidence that was presented to me, that in fact you knew you

16   weren't supposed to be in possession of a firearm at that

17   time.

18           And so for those reasons, looking at those two

19   together, I don't know what conditions I'm a gonna set that's

20   gonna assure the safety of the community from the threats

21   which are themselves a danger and the firearms which could --

22   the fact that you're possessing a firearm when out there

23   tells me that there's a threat of violence as well.

24           Now I see that you're raising your hand, sir, and

25   I'm happy to hear anything you'd like to say.  However, I

1   always counsel any defendant before me.  Two things about it:

2   One is, you always should talk to your attorney before

3   presenting any evidence.  The other thing is, with all facts,

4   all cases like, and this case and any other case, you know,

5   the facts are -- this is very early on in the case.  As your

6   attorney has mentioned, he hasn't even seen the entirety of

7   the video that's been mentioned.  There's a lot of other

8   evidence that's gonna have to be taken into account in this

9   case.  Mr. Lara will tell you.  He's an experienced attorney.

10  He will tell you that I always will reconsider my decision if

11  additional evidence is presented in front of me.

12          So if there is additional evidence as we go

13  forward, and you want me to reconsider this decision, all

14  Mr. Lara has to do is file the motion with me.  But that's my

15  ruling at this time.  But, that being said, you do have a

16  right to speak, sir.  I will ask Mr. Lara to speak to you

17  before you do that, sir.

18          (Attorney and Defendant conferring)

19          DEFENDANT USSERY:  Yes, Your Honor.  I just wanted

20  to look at you in your eye, Your Honor, and say I want to get

21  back to my home and residence.  My mother really needs me.  I

22  give you my word I'd never be a threat to anybody.

23          THE COURT:  All right.

24          DEFENDANT USSERY:  Ever.  Oh, I just want to do the

25  right thing to do good.  All I can say is for 30 years I've

1    dedicated my life to them.  I just want to see them.  I don't

2    want to -- I want to see them before my stepfather dies.

3    That's all.

4              THE COURT:  All right.  All right, Mr. Ussery,

5    thank you.

6              DEFENDANT USSERY:  Thank you.

7              THE COURT:  I've considered the statements that you

8    made.  However, the ultimate -- and I should make very clear,

9    I'm not deciding your guilt or innocence of any offense.  The

10   thing I have to look at is the safety of the community for

11   your release.

12             And based on the evidence presented to me right

13   now, I'm not changing my decision.  However, I'll note that.

14   And if new evidence comes forward, Mr. Lara, as I said, will

15   know exactly how to present anything that needs to be

16   presented to me.  I retain jurisdiction over this case to

17   reconsider, if necessary.

18             But that's the court's ruling at this time.

19             Ms. Wannarka, anything further from the government

20   at this time?

21             MS. WANNARKA:  No, Your Honor.  Thank you.

22             THE COURT:  All right.  Mr. Lara, anything further

23   from the defense at this time?

24             MR. LARA:  Nothing further, Judge.

25             THE COURT:  I have considered all these affidavits,

1    but I'm going to hand them back to you, sir, in case you need

2    them--

3              DEFENDANT USSERY:  Yes, sir.

4              THE COURT:  -- for further proceedings in this

5    case.  We'll be in recess.

6              THE COURT SECURITY OFFICER:  All rise.

7              (Adjournment)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   UNITED STATES DISTRICT COURT   )

 2   WESTERN DISTRICT OF TEXAS      )

 3            I certify that the foregoing is a correct

 4   transcript from the record of proceedings in the

 5   above-entitled matter.  I further certify that the transcript

 6   fees and format comply with those prescribed by the Court and

 7   the Judicial Conference of the United States.

 8   Date signed:    July 10, 2018.

 9

10

11                          /s/  Leticia Ornelas Rangel
                            LETICIA O. RANGEL
12                          United States Court Reporter
                            655 East Cesar E. Chavez Blvd.,
13                          Room 319A
                            San Antonio, Texas 78206
14                          (210) 244-5039

15

16

17

18

19

20

21

22

23

24

25
```

Leticia Ornelas Rangel, CSR